UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————————
JASON E. LELIO,                                )
                                               )
                    Plaintiff,                 )
                                               )
v.                                             )          Civil Action No. 15-10335-MLW
                                               )
MARSH USA, INC.,                               )
                                               )
                    Defendant.                 )
———————————————————————  )

REPORT AND RECOMMENDATION ON DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
[Docket No. 42]

June 19, 2017

Boal, M.J.

Plaintiff Jason Lelio, a former employee of defendant Marsh USA, Inc. ("Marsh"), alleges that Marsh owes him $50,000 in compensation. Lelio has asserted claims for violations of the Massachusetts Wage Act, breach of contract, breach of the covenant of good faith and fair dealing, promissory estoppel, and quantum meruit. Marsh has moved for summary judgment on all of Lelio's claims against it. Docket No. 42.[1] For the following reasons, the Court recommends that the District Judge assigned to this case grant Marsh's motion for summary judgment.

I.      PROCEDURAL HISTORY

On October 30, 2014, Lelio filed his complaint in Massachusetts Superior Court. Docket No. 5 at 2-11. Marsh removed the case to this Court on February 11, 2015. Docket No. 1.

———————————————————

[1] On September 29, 2015, the District Court referred the case to the undersigned for full pretrial management, including report and recommendation on dispositive motions. Docket No. 24.

On February 18, 2015, Marsh filed a motion to dismiss the complaint.  Docket No. 7.

The District Court denied the motion on September 29, 2015.  Docket No. 23.

On September 19, 2016, Marsh filed the instant motion for summary judgment.  Docket

No. 42.  Lelio filed an opposition on October 19, 2016.  Docket No. 46.  On November 3, 2016,

Marsh filed a reply.  Docket No. 50.

The Court heard oral argument on June 16, 2017.

II.    FACTS[2]

    A.    Lelio's Hire

Lelio applied to work at Marsh in or about early 2007.[3]  After interviewing Lelio by

phone and in-person, Financial Accounting Claims Services ("FACS") Northeast Region Leader,

Raymond Hutnik, offered Lelio a Senior Consultant position in Marsh Risk Consulting's

("MRC") FACS practice group.[4]

Mr. Hutnik explained the compensation package being offered to Lelio, including a base

salary of $175,000, a signing bonus, and eligibility for annual incentive compensation that would

be based "on the group's performance and [Lelio's] performance."[5]  Mr. Hutnik did not provide

---

[2]  The facts are largely undisputed.  Because this case is before the Court on a motion for summary judgment, the Court sets out any properly disputed facts in the light most favorable to Lelio, the non-moving party.  See DeNovellis v. Shalala, 124 F.3d 298, 302 (1st Cir. 1997).  The facts are derived from the Final Responses to Defendant's Statement of Material Facts and Plaintiff's Statement of Additional Material Facts in Support of His Opposition to Defendant's Motion for Summary Judgment.  Docket No. 53.  The Court refers to Marsh's statements as "Def. SOF;" to Lelio's Responses as "Pl. Resp.;" to Marsh's replies as "Def. Reply;" to Lelio's statements of additional facts as "Pl. SOF;" and to Marsh's responses as "Def. Resp."

[3]  Def. SOF ¶ 1; Pl. Resp. ¶ 1.

[4]  Def. SOF ¶ 2; Pl. Resp. ¶ 2.

[5]  Def. SOF ¶ 3; Pl. Resp. ¶ 3.

any more detail regarding incentive compensation during this discussion.[6]

In addition to his Senior Consultant title, Lelio was given an officer title upon hire – Vice President.[7]  In or about 2008, Lelio was promoted to Senior Vice President.[8]  By 2013, Lelio had also been promoted to a Managing Consultant position.[9]

On May 25, 2007, Marsh sent Lelio an offer letter that outlined his $175,000 base salary and a signing bonus.[10]  The offer letter did not reference incentive compensation and Lelio does not recall receiving any documents relating to incentive compensation upon hire.[11]  The letter did, however, direct Lelio to Marsh's intranet site for information about benefits available to him.[12]  The letter also stated: "This offer letter supersedes all prior agreements and understandings oral or written between you and the Company."[13]  On June 4, 2007, Lelio signed the offer letter and returned it to Marsh.[14]

Upon hire, Lelio executed a document stating: "I acknowledge that no supervisor, manager or other representative of MMC or Marsh has the authority to make any verbal promises, commitments or statements of any kind regarding MMC's and Marsh's policies,

---

[6] Def. SOF ¶ 4; Pl. Resp. ¶ 4.

[7] Def. SOF ¶ 5; Pl. Resp. ¶ 5; Pl. SOF ¶ 2; Def. Resp. ¶ 2.

[8] Def. SOF ¶ 5; Pl. Resp. ¶ 5.

[9] Def. SOF ¶ 5; Pl. Resp. ¶ 5; Pl. SOF ¶ 2; Def. Resp. ¶ 2.

[10] Def. SOF ¶ 6; Pl. Resp. ¶ 6; Pl. SOF ¶ 3; Def. Resp. ¶ 3.

[11] Def. SOF ¶ 7; Pl. Resp. ¶ 7.

[12] Def. SOF ¶ 8; Pl. Resp. ¶ 8.

[13] Def. SOF ¶ 68; Pl. Resp. ¶ 68.

[14] Def. SOF ¶ 15; Pl. Resp. ¶ 15.

procedures or any other issues that are legally binding on MMC and/or Marsh."[15]

Lelio accessed Marsh's intranet site numerous times throughout his employment, including when he signed up for benefits, completed his self-evaluations and reviewed Mr. Hutnik's evaluations of his performance.[16]  Included among such information on Marsh's intranet site is a document entitled, Compensation At Marsh, A Guide For Colleagues ("Compensation Guide"), which details the compensation available to Marsh employees.[17]  While the Compensation Guide is updated regularly, its description of incentive compensation remained materially the same throughout Lelio's employment.[18]

The 2013 – 2014 Compensation Guide's section on "Components of Total Compensation" states that Marsh employees are eligible for various types of incentive compensation, including Discretionary Bonuses, Sales Compensation, and Long-Term Incentive.[19]  With respect to Discretionary Bonus (referred to as "ICP"), the Compensation Guide states:

> Given that the ICP is directly related to the performance of Marsh, bonuses will increase or decrease from year to year and are, therefore, a true example of variable pay. . . . [R]eceiving a bonus one year doesn't necessarily mean you will receive one in the following year.  In other words, bonuses are truly

---

[15] Def. SOF ¶ 67; Pl. Resp. ¶ 67.

[16] Def. SOF ¶ 9; Pl. Resp. ¶ 9.

[17] Def. SOF ¶ 10; Pl. Resp. ¶ 10.

[18] Def. SOF ¶ 11; Pl. Resp. ¶ 11.  While Lelio does not dispute that the Compensation Guide's description of incentive compensation remained materially the same throughout his employment, he also states that "the equivalent Compensation Guide for managers did materially change during the same time" and "Lelio was not privy to such changes."  Pl. Resp. ¶ 11.  However, the record cites by Lelio do not actually support his statements.

[19] Def. SOF ¶ 12; Pl. Resp. ¶ 12; see also Pl. SOF ¶ 7; Def. Resp. ¶ 7.

discretionary.[20]

With respect to Long Term Incentive (referred to as "LTI"), the Compensation Guide
states:

> Long-term incentive plans are designed to reward a colleague's potential success
> as well as assure the company's longer-term business goals are achieved.  The Long
> Term Incentive Plan (LTIP) provides awards to key colleagues whose contributions
> today can impact Marsh's future success. . . . LTIP awards are 'vested' or earned
> over a period of time, usually over 3 to 4 years from the date of the grant.[21]

Marsh's Compensation Guide stated that incentive compensation, including both ICP and

LTI, was entirely discretionary.[22]

Marsh also produced a guide entitled "2013 – 2014 Compensation at Marsh: A Guide for

Managers."[23]  Lelio maintains that he did not receive a copy of this guide.[24]  The Guide for

Managers stated that "[o]ver the next few years in order to meet our challenging growth

initiatives there will be a shift in the pay mix from short-term to more long-term incentives for

many of our highest performing senior leaders."[25]  The corresponding section in the

Compensation Guide did not contain this language.[26]

     B.    <u>The MRC 2008 Compensation Plan Presentation</u>

In February 2008, Lelio attended a presentation at which MRC's goals relating to ICP for

---

[20] Def. SOF ¶ 13; Pl. Resp. ¶ 13.

[21] Def. SOF ¶ 14; Pl. Resp. ¶ 14; Pl. SOF ¶¶ 8-9; Def. Resp. ¶¶ 8-9.

[22] Def. SOF ¶ 65; Pl. Resp. ¶ 65.

[23] Pl. SOF ¶ 11; Def. Resp. ¶ 11.

[24] Pl. SOF ¶ 12.

[25] Pl. SOF ¶ 13; Def. Resp. ¶ 13.

[26] Pl. SOF ¶ 14; Def. Resp. ¶ 14.

performance year 2008 were discussed ("2008 Presentation").[27]  The PowerPoint slides detailing

the presentation, which Lelio received and reviewed during his employment, included a chart

that provided for a guaranteed minimum ICP for several positions, including senior consultants.[28]

Managing consultants were not among those guaranteed a minimum bonus in the 2008

Presentation.[29]  During 2008, Lelio was a Senior Consultant; by 2013, Lelio had been promoted

to Managing Consultant.[30]

The 2008 Presentation materials stated that they set forth "general guidelines only, and

management [had] complete discretion to allocate Discretionary Bonuses [ICP] in a way that

depart[ed] from these guidelines."[31]  The materials also directed employees to Marsh's intranet

site for addition information about incentive compensation.[32]  The presentation materials also

stated that the 2008 Presentation was "[e]ffective for calendar year 2008."[33]

The PowerPoint was entitled "MRC 2008 Bonus Program Overview," and at the top of

several slides in large bold text were the words "MRC 2008 Bonus Plan."[34]  The materials stated

that bonus eligibility would depend on MRC achieving performance goals set for 2008 and that

---

[27] Def. SOF ¶ 16; Pl. Resp. ¶ 16; see also Pl. SOF ¶ 4; Def. Resp. ¶ 4.

[28] Def. SOF ¶ 17; Pl. Resp. ¶ 17.

[29] Def. SOF ¶ 17; Pl. Resp. ¶ 17.

[30] Def. SOF ¶ 18; Pl. Resp. ¶ 18.

[31] Def. SOF ¶ 19; Pl. Resp. ¶ 19.

[32] Def. SOF ¶ 20; Pl. Resp. ¶ 20.

[33] Def. SOF ¶ 21; Pl. Resp. ¶ 21.

[34] Def. SOF ¶ 22; Pl. Resp. ¶ 22.

incentive compensation relating to performance year 2008 would be paid by March 15, 2009.[35]

Lelio testified at deposition that the 2008 Presentation was not a contract and that he did not know if the guidelines detailed therein had ever been applied.[36]

C.    Marsh's Incentive Compensation Practices

During Lelio's employment, then-FACS Global Leader Kevin McCarthy was responsible for allocating and distributing year-end compensation awards for the FACS group across the United States.[37]  Toward the end of each calendar year, Mr. McCarthy created a spreadsheet listing all FACS employees and their performance data, including billed hours, revenue generated, annual performance ratings, and prior year compensation awards.[38]  Mr. McCarthy would then receive an estimate of how much money would be allocated to the salary, ICP and LTI pools[39] at year end.[40]

Relying on these estimated pools, Mr. McCarthy, Mr. Hutnik and then Growth Leader of FACS, John Albrecht ("FACS Leadership") would propose compensation awards for FACS employees, including any salary increase, ICP and/or LTI.[41]  In doing so, FACS Leadership exercised wide discretion – in addition to the quantitative performance data outlined in the

---

[35] Def. SOF ¶ 23; Pl. Resp. ¶ 23.

[36] Def. SOF ¶ 69; Pl. Resp. ¶ 69.

[37] Def. SOF ¶ 24; Pl. Resp. ¶ 24.

[38] Def. SOF ¶ 25; Pl. Resp. ¶ 25.

[39] Marsh uses the term "pool" to refer to the sum of money available for each compensation type. Def. SOF ¶ 27; Pl. Resp. ¶ 27.

[40] Def. SOF ¶ 26; Pl. Resp. ¶ 26.

[41] Def. SOF ¶ 28; Pl. Resp. ¶ 28.

spreadsheet, the managers also considered qualitative factors, such as the employee's initiative, enthusiasm, and future potential.[42]  No arithmetic calculations were used to arrive at the proposed compensation figures.[43]

FACS Leadership thereafter met to discuss and finalize the proposed awards, during which it was not uncommon for such proposals to increase or decrease.[44]  Changes to proposed compensation were also made for reasons outside FACS Leadership's control.[45]  For example, Marsh occasionally sets "salary caps," barring managers from increasing the salaries of "highly compensated" employees (e.g., employees making $200,000 or more).[46]  The salary threshold for determining which colleagues were "highly compensated" varied from performance year to performance year.[47]

Marsh also typically set minimum LTI award amounts (e.g., no less than $50,000).[48] These salary caps and LTI minimums were often not communicated to FACS Leadership until after they had made their initial round of compensations proposals, necessitating revisions to such proposals.[49]

In or about mid-to-late January of each year, Mr. McCarthy would receive notice of the

---

[42] Def. SOF ¶ 29; Pl. Resp. ¶ 29.

[43] Def. SOF ¶ 30; Pl. Resp. ¶ 30.

[44] Def. SOF ¶ 31; Pl. Resp. ¶ 31.

[45] Def. SOF ¶ 32; Pl. Resp. ¶ 32.

[46] Def. SOF ¶ 33; Pl. Resp. ¶ 33.

[47] Def. SOF ¶ 34; Pl. Resp. ¶ 34.

[48] Def. SOF ¶ 35; Pl. Resp. ¶ 35.

[49] Def. SOF ¶ 36; Pl. Resp. ¶ 36.

actual amounts in his compensation pools.[50]  Depending on the accuracy of the initial pool estimates, the final pool information could result in additional revisions to the proposed compensation awards.[51]  Once FACS leadership had finalized its proposed compensation awards, Mr. McCarthy would submit such proposals to then-Global Head of FACS, Ken Giambagno, who would make further revisions before sending the information further up the chain, ultimately to Marsh senior leadership for final approval.[52]  Once senior leadership approved the figures, Mr. Hutnik and Mr. Albrecht communicated the compensation awards to their direct reports, such as Lelio.[53]

> D.    Lelio's ICP For Years 2007-2012

Marsh awarded Lelio ICP awards for performance years 2007 through 2012 in the following amounts:  $3,000 (2007); $25,000 (2008); $15,000 (2009); $25,000 (2010); $30,000 (2011); $40,000 (2012).[54]  Lelio did not receive any LTI awards from 2007-2012.[55]

Lelio did not know what his incentive compensation awards would be for performance years 2007 through 2012 until Mr. Hutnik met with Lelio to communicate such awards in mid-to late February of each year.[56]  Lelio does not know how his incentive compensation awards for these years were determined, including whether any calculation was used to arrive at the

---

[50] Def. SOF ¶ 37; Pl. Resp. ¶ 37.

[51] Def. SOF ¶ 38; Pl. Resp. ¶ 38.

[52] Def. SOF ¶ 39; Pl. Resp. ¶ 39.

[53] Def. SOF ¶ 40; Pl. Resp. ¶ 40.

[54] Def. SOF ¶ 41; Pl. Resp. ¶ 41; Pl. SOF ¶ 15; Def. Resp. ¶ 15.

[55] Def. SOF ¶ 42; Pl. Resp. ¶ 42.

[56] Def. SOF ¶ 43; Pl. Resp. ¶ 43.

figures.[57]  Lelio does not know how his ICP awards compared to awards given to other FACS employees, or whether his FACS colleagues received ICP or LTI awards during his employment.[58]

       E.     <u>Lelio's 2013 Incentive Compensation And Resignation</u>

Lelio maintains that 2013 was a "banner year" for him.[59]  In early 2014, when Marsh was contemplating its compensation awards, Raymond Hutnik shared an email, written by Lelio, summarizing his achievements for the year. In that email, Hutnik remarked that it is a "reasonably accurate reflection of his year and supports a place among the short list of top performers."[60]  Lelio's performance rating for 2013 was a 4 on a scale of 5, with 5 the highest ranking.[61]

On February 18, 2014, Mr. Hutnik informed Lelio of his compensation awards for performance year 2013.[62]  Lelio received a $10,500 salary increase in 2014.[63]  Lelio was also awarded incentive compensation in the amount of $60,000, $10,000 of which was a cash ICP award immediately payable and $50,000 of which was LTI, to be paid as restricted cash vesting one third annually over the following three years.[64]

---

[57] Def. SOF ¶ 44; Pl. Resp. ¶ 44.

[58] Def. SOF ¶ 45; Pl. Resp. ¶ 45.

[59] Pl. SOF ¶ 17.

[60] Pl. SOF ¶ 17.

[61] Pl. SOF ¶ 25; Def. Resp. ¶ 25.

[62] Def. SOF ¶ 49; Pl. Resp. ¶ 49.

[63] Def. SOF ¶ 50; Pl. Resp. ¶ 50.

[64] Def. SOF ¶ 51; Pl. Resp. ¶ 51; <u>see also</u> Pl. SOF ¶ 35; Def. Resp. ¶ 35.

Lelio had sought an LTI award for performance year 2013.[65]  Lelio fell into the "highly compensated" category in 2012, and therefore did not receive a salary increase for 2013.[66]  As a result, Mr. Hutnik advocated for Lelio to receive a mid-year (or, "off-cycle") raise in 2013, without success.[67]  Instead, Lelio was informed that he would be eligible for LTI for performance year 2013.[68]  Lelio emailed Mr. Hutnik on January 14, 2014 to remind him of this, stating:  "I did not get a raise during the normal review period [in 2012] and was told I was approved for an 'off cycle' raise, but it was turned down by the last approver.  Instead, I was told that I would be eligible for the LTIP compensation program."[69]

As stated in the Compensation Guide, incentive compensation at Marsh can take a variety of forms, including ICP and LTI.[70]  While Lelio first received an LTI award for performance year 2013, LTI was routinely awarded to FACS employees during Lelio's employment.[71]  Because LTI is awarded in minimum amounts (e.g., $50,000 in 2013), typically only those employees with higher salaries and receiving larger incentive compensation awards receive LTI.[72]

On or about February 24, 2014, Marsh emailed Lelio his LTI award grant package, which

---

[65] Def. SOF ¶ 52; Pl. Resp. ¶ 52.

[66] Def. SOF ¶ 53; Pl. Resp. ¶ 53.

[67] Def. SOF ¶ 54; Pl. Resp. ¶ 54.

[68] Def. SOF ¶ 55; Pl. Resp. ¶ 55.  Lelio "disputes" this fact but his response does not actually contradict it.  Instead, Lelio argues facts outside the scope of Marsh's statement.  Pl. Resp. ¶ 55.

[69] Def. SOF ¶ 56; Pl. Resp. ¶ 56.

[70] Def. SOF ¶ 46; Pl. Resp. ¶ 46.

[71] Def. SOF ¶ 47; Pl. Resp. ¶ 47; see also Pl. SOF ¶ 18; Def. Resp. ¶ 18.

[72] Def. SOF ¶ 48; Pl. Resp. ¶ 48.

included an "overview" brochure outlining the LTI award, the complete terms and conditions of the LTI award, and a restrictive covenant agreement ("RCA").[73]  The RCA included client, prospective client, and employee non-solicitation provisions identical in scope and duration to the Non-Solicit Agreement Lelio executed upon hire.  The RCA did not include a non-compete provision.[74]  The email directed Lelio to review these documents, which were posted on Marsh's intranet site, and, if he wished to accept the LTI, click the "accept" button on the site.[75]  Lelio's 2013 LTI award was expressly conditioned on his continued employment and execution of the RCA.[76]  Lelio does not recall reviewing any of the LTI documents, but acknowledges he did not accept the LTI award.[77]

Lelio maintains that a change was made in bonuses from cash payments to LTI awards, subject to vesting periods, in order to retain employees at risk of leaving Marsh for competitors, including Lelio.[78]

Sometime after February 18, 2014, Lelio complained to McCarthy about the transition from cash bonuses to LTI awards.[79]  On July 2, 2014, Lelio resigned.[80]  By email to Marc Allen, Marsh's Global HR Leader, Lelio requested that the "balance of [his] incentive compensation"

---

[73] Def. SOF ¶ 57; Pl. Resp. ¶ 57.

[74] Def. SOF ¶ 58; Pl. Resp. ¶ 58.

[75] Def. SOF ¶ 59; Pl. Resp. ¶ 59.

[76] Def. SOF ¶ 74; Pl. Resp. ¶ 74; see also Pl. SOF ¶ 38.

[77] Def. SOF ¶ 61; Pl. Resp. ¶ 61.

[78] See Pl. SOF ¶¶ 19-24.

[79] Pl. SOF ¶ 36; Def. Resp. ¶ 36.

[80] Def. SOF ¶ 62; Pl. Resp. ¶ 62.

be paid fortwith.[81]  Marsh declined to pay any such compensation.[82]

III.    ANALYSIS

In this action, Lelio seeks to recover the $50,000 in LTI he was awarded, but did not receive, in 2014.  He argues that sometime in late 2013 or 2014, Marsh realized that Lelio, among other key employees, was a high risk for departure.  Docket No. 46 at 3.  Therefore, according to Lelio, Marsh decided to try to "lock down" employees by changing the compensation structure.  Id.  Instead of paying his incentive compensation in a lump sum cash award, as it had done in previous years, Marsh awarded $50,000 out of his total $60,000 incentive compensation as LTI.  Id.  Such an LTI award required Marsh to execute certain restrictive covenants as well as remain employed for another three years.  Id.  In Lelio's view this constituted a "retroactive" change to his compensation.  Id. at 5.  For the reasons set forth below, however, the Court finds that Lelio's theories are unavailing and Marsh is entitled to summary judgment on all of Lelio's claims.

A.    Standard Of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party."  Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996) (quotations and citations omitted).  A material fact is one which has "the potential to affect the outcome of the suit under the applicable law."  Id. (quotations and citations omitted).

---

[81] Pl. SOF ¶ 39; Def. Resp. ¶ 39.

[82] Pl. SOF ¶ 40; Def. Resp. ¶ 40.

The moving party bears the initial burden of establishing that there is no genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If that burden is met, the opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial.  See id. at 324.  "[T]he non-moving party 'may not rest upon mere allegation or denials of his pleading,'" but must set forth specific facts showing that there is a genuine issue for trial.  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).

The court must view the record in the light most favorable to the non-moving party and indulge all reasonable inferences in that party's favor.  See O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993).  However, "[a]s to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party."  In re Spigel, 260 F.3d 27, 31 (1st Cir. 2001) (citation omitted).  "If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate."  Walsh v. Town of Lakeville, 431 F. Supp. 2d 134, 143 (D. Mass. 2006).[83]

---

[83] Lelio cites to Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000), for the proposition that "the Court must *ignore* all evidence favoring the Defendants that a jury might not believe – such as evidence provided by witnesses who are biased, interested, or whose credibility is tainted."  Docket No. 46 at 3 (emphasis in original).  According to Lelio, this Court must disregard the affidavits offered by Marsh because they come from interested employees.  Id.  The First Circuit, however, has rejected this reading of Reeves.  "At summary judgment we need not exclude all interested testimony, specifically testimony that is uncontradicted by the nonmovant."  Dennis v. Osram Sylvania, Inc., 549 F.3d 851, 856 (1st Cir. 2008) (citation omitted).  Here, the material facts are largely undisputed.  Not only has Lelio failed to offer evidence to contradict Marsh's statement of undisputed facts, but has admitted virtually all statements of fact submitted by Marsh.

B.    Lelio's Breach Of Contract Claim Fails As A Matter Of Law

Marsh argues that Lelio's breach of contract claim fails because he cannot demonstrate that Marsh breached any contractual obligations to him in connection with his 2013 incentive compensation.  Docket No. 43 at 11-12; Docket No. 50 at 3-10.  This Court agrees.

Under Massachusetts law,[84] in order to succeed in his breach of contract claim, Lelio must show that (1) the parties reached a valid and binding agreement with regard to incentive compensation; (2) Marsh breached the terms of that agreement; and (3) Lelio suffered damages as a result of the breach.  Michelson v. Digital Fin. Servs., 167 F.3d 715, 720 (1st Cir. 1999) (citing Coll v. PB Diagnostic Sys., Inc., 50 F.3d 1115, 1122 (1st Cir. 1995)).

Contract interpretation is a question of law for the court.  Weiss v. DHL Exp., Inc., 718 F.3d 39, 44-45 (1st Cir. 2013) (citing Seaco Ins. Co. v. Barbosa, 435 Mass. 772 (2002)). "[W]hen several writings evidence a single contract or comprise constituent parts of a single transaction, they will be read together."  Id. at 45 (quoting FDIC v. Singh, 977 F.2d 18, 21 (1st Cir. 1992)).  "Absent ambiguity, the court interprets a contract according to its plain terms, in a manner that gives reasonable effect to each of its provisions."  Id. (internal quotations and citations omitted).

"A contract is not ambiguous simply because litigants disagree about its proper interpretation."  Id. (citing Singh, 977 F.2d at 22).  "Ambiguity arises only if the language 'is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.'"  Id. (citing S. Union Co. v. Dep't of Pub. Utils., 458 Mass.

---

[84] Both parties have cited to Massachusetts law in their papers.  Where the parties have agreed as to the choice of law, courts are "free to 'forego an independent analysis and accept the parties' agreement.'"  Hershey v. Donaldson, Lufkin & Jenrette Sec. Corp., 317 F.3d 16, 20 (1st Cir. 2003) (citation omitted).

812 (2011)).

Identification of the relevant contract and its terms has been a moving target throughout this litigation.  In his opposition to Marsh's motion to dismiss, Lelio stated that his claims were not based on the Compensation Guide and moved to strike the Compensation Guide from consideration by the District Court.  Docket No. 12 at 1, 3-4.  Indeed, he stated that he did not know the Compensation Guide existed and never saw it prior to Marsh filing its motion to dismiss.  Id. at 3.  In his sworn answers to interrogatories, Lelio pointed to the 2008 Presentation as the basis for his contract claims.  See Docket No. 50-2 at 9.  Later, during his deposition, Lelio stated that he did not believe that the 2008 Presentation was a contract but rather that he was relying on statements made to him by Mr. Hutnik.  See Def. SOF ¶¶ 63, 69; Pl. Resp. ¶¶ 63, 69.

Lelio still has not clearly identified the contract at issue here.  In his opposition to Marsh's motion for summary judgment, Lelio first states that the Compensation Guide, "[t]aken together with the conversations with Hutnik, the 2008 PowerPoint Presentation, and Marsh's past practices. . . make up the terms and conditions of his employment compensation."  Docket No. 46 at 6.  However, he later states that "the structure of Lelio's compensation should be interpreted solely from the 2013-2014 [Compensation Guide]."  Id. at 8 (emphasis added).  At oral argument, Lelio's counsel also suggested conduct on the part of Marsh formed part of the contract.[85]  Lelio's shifting arguments are fatal to his breach of contract claim because he fails to

---

[85] In all likelihood because of Lelio's failure to specifically identify the alleged contract and its terms and his reliance at least in part on oral statements, Marsh argues that Lelio's claims are barred by the statute of frauds.  Docket No. 43 at 10-11.  Lelio has failed to address this argument in his opposition to Marsh's motion for summary judgment.  Because the Court has concluded that Lelio's breach of contract claims fails in any event, it is not necessary to address whether the Statute of Frauds also bars Lelio's claims.

meet the most basic element of such a claim – identifying with specificity the nature and terms of his alleged contractual agreement with Marsh.  Doyle v. Hasbro, Inc., 103 F.3d 186, 194-195 (1st Cir. 1996) ("It is essential to state with substantial certainty the facts showing the existence of the contract and the legal effect thereof.") (internal quotations and citation omitted).

Even assuming that the relevant contract is comprised of Hutnik's representations, the 2008 Presentation, and the Compensation Guide, Lelio has failed to point to any evidence to create a triable issue of fact that any such agreements were breached.  Lelio has failed to identify any specific promise by Hutnik that was breached.  See Def. SOF ¶ 64; Pl. Resp. ¶ 64.  He has also failed to point to any specific term either in the 2008 Presentation or the Compensation Guide that was breached.  The 2008 Presentation does not guarantee him any incentive compensation at all.  To the extent that the 2008 Presentation refers to guaranteed minimum bonuses, those guarantees applied only to Senior Consultants.  Def. SOF ¶ 17; Pl. Resp. ¶ 17.  By 2013, Lelio was no longer a Senior Consultant, but had been promoted to Managing Consultant. Def. SOF ¶ 18; Pl. Resp. ¶ 18.  Therefore, Lelio cannot rely on the 2008 Presentation to support his claim for breach of contract with respect to payment of incentive compensation in 2013.

Similarly, Lelio has failed to identify in what way the Compensation Guide was breached.  The Compensation Guide does not contain any agreement or promise to award incentive compensation at all, never mind in any particular amount or any particular form.  Def. SOF ¶ 13; Pl. Resp. ¶ 13.  Rather, the Compensation Guide makes it clear that incentive compensation is "truly discretionary."  Id.  The Compensation Guide also makes clear that Marsh may choose to grant employees LTI awards, which "are 'vested' or earned over a period of time, usually over 3 to 4 years from the date of the grant."  Def. SOF ¶ 14; Pl. Resp. ¶ 14.  Thus, Marsh acted consistent with the terms of the Compensation Guide when it awarded Lelio

$10,000 in a cash ICP award as well as a $50,000 LTI award that would vest over a period of three years.

Further, Lelio does not dispute that the LTI award was contingent on him remaining employed at Marsh for three years and subject to other restrictions, which he did not meet.  Def. SOF ¶ 51; Pl. Resp. ¶ 51.  Accordingly, Lelio has failed to point to any evidence that Marsh breached any agreements between them.

Lelio argues that Marsh "retroactively" changed its compensation policies by awarding the bulk of his 2013 incentive compensation as LTI.  Docket No. 46 at 5, 8-9.  To support this argument, Lelio relies on the following statement in the managerial counterpart to the Compensation Guide, "Compensation at Marsh: A Guide for Managers," which states that "over the next few years . . . there will be a shift in the pay mix from short-term to more long-term incentives for many of our highest performing senior leaders."  Id. at 8.  However, Lelio has not pointed to any evidence that this was a change in policy.  At oral argument, Lelio referenced a series of emails that discussed forms of compensation.  Docket Nos. 45-11, 45-12, 45-13, 45-14.  Such discussions themselves, however, are not the proper basis for a breach of contract claim.  As discussed above, the Compensation Guide was always clear that incentive compensation may take a number of forms, including ICP and LTI, that the amount of such awards is wholly within Marsh's discretion, and that what an employee receives in one year in no way indicates what he or she will receive in a later year.  Def. SOF ¶¶ 12-14; Pl. Resp. ¶¶ 12-14.  Although Lelio had not received an LTI award in years prior to 2013, other employees had, and the terms of the Compensation Guide made clear that Marsh had discretion in doing so.  Def. SOF ¶¶ 46-47; Pl. Resp. ¶¶ 46-47; Docket No. 44-9 at 7-9.  Thus, there is no evidence in the summary judgment record that Marsh retroactively altered its compensation policies.

18

Accordingly, the Court finds that there is no triable issue of fact with respect to Lelio's breach of contract claim.

C.    Lelio Cannot Prevail On His Wage Act Claim Because
      Incentive Compensation Is Not a Wage Under The Act

Lelio's failure to show any evidence that Marsh failed to pay him incentive compensation to which he was entitled necessarily defeats his Wage Act claim. In addition, Marsh argues Lelio cannot prevail on his Wage Act claim because the undisputed facts show that his incentive pay did not constitute wages under the Wage Act. Docket No. 43 at 12-14. The Court agrees.

The purpose of the Wage Act is "to prevent the unreasonable detention of wages." Weems v. Citigroup, Inc., 453 Mass. 147, 150 (2009) (citations omitted). To that end, the Wage Act requires the prompt payment of "wages earned" on pain of civil and criminal penalties, treble damages, and attorney's fees. Weiss, 718 F.3d at 47 (citing M.G.L. c. 149, §§ 148, 150). "While the Act makes clear on its face that holiday pay, vacation pay, and definitely determined commissions fall within its protections, the term 'wages' is not otherwise defined." Id.

The Supreme Judicial Court ("SJC") has held that discretionary bonuses are not wages within the meaning of the Wage Act. See Weems, 453 Mass. at 153-154. Similarly, the First Circuit has held that a bonus with the contingency of continued employment was not a wage under the Wage Act. Weiss, 718 F.3d at 47-48. Here, Lelio's LTI award was both wholly discretionary and contingent on his continued employment at Marsh. Def. SOF ¶¶ 14, 51, 65, 74; Pl. Resp. ¶¶ 14, 51, 65, 74. Accordingly, the Court finds that Lelio's claim for the payment of the $50,000 LTI is outside the scope of the Wage Act.

D.    Lelio Cannot Maintain A Claim For Breach Of The Covenant
      Of Good Faith And Fair Dealing Because He Voluntarily Resigned

At oral argument, Lelio stated that he did not oppose the entry of summary judgment against him on this claim.  In any event, summary judgment should be granted on the merits.  To prevail on a claim for breach of the covenant of good faith and fair dealing in the employment context, the plaintiff must establish (1) status as an at-will employee; (2) termination of employment; (3) termination without "good cause" or in "bad faith;" and (4) termination with the purpose of depriving the employee of benefits to which he is entitled.  Vonachen v. Computer Associates Inter., Inc., 524 F. Supp. 2d 129, 137 (D. Mass. 2007) (citations omitted).  Such a claim is generally referred to as a Fortune claim.  See Fortune v. Nat'l Cash Register Co., 373 Mass. 96 (1977).  Here, Lelio cannot show that he was terminated because it is undisputed that he voluntarily resigned.  Def. SOF ¶ 62; Pl. Resp. ¶ 62; see also Docket No. 46 at 10.

Lelio acknowledges that he that he does not have a Fortune claim because he was not terminated.  Docket No. 46 at 10.  Rather, he argues that he was deprived of compensation for work already performed.  Id.  In other words, Lelio argues that Marsh's "retroactive" change to its compensation practices was in bad faith and, therefore, breached the covenant of good faith and fair dealing.  Id.  In so doing, he cites to Ayash v. Dana-Farber Cancer Institute, 443 Mass. 367 (2005).  See Docket No. 46 at 11.  Ayash, however, is inapposite.  Ayash addressed the Fortune doctrine as applied to the hospital-physician employment relationship.  Specifically, the SJC stated that:

> In the specific context of a physician-hospital employment relationship, we
> have assumed (but not yet decided) that a physician whose staff privileges
> have been terminated by a hospital may assert a claim of breach of the
> implied covenant of good faith and fair dealing against the hospital based
> on its alleged bad faith failure to follow its own bylaws.  Such a claim would
> premised on the hospital's breach of its promise, implicit in the employment
> relationship, to abide by its own bylaws in its conduct toward its physicians.

20

Id. at 386 (emphasis added; internal citations omitted).  The SJC went on to assume that the hospital violated the implied covenant of good faith and fair dealing when it restricted the plaintiff's privileges without first notifying her of her right to request a hearing.  Id. at 388.  The SJC nevertheless found against the plaintiff because she had offered no evidence that she suffered a compensable loss as a result of the breach.  Id.  Thus, Ayash does not apply to the facts of this case.

In any event, Lelio has presented no evidence that Marsh deprived him of any income he reasonably earned or to which he was entitled.  As discussed above, there is no evidence in the record to support his argument that Marsh retroactively changed his compensation or that it violated the terms of the Compensation Guide.  Instead, the evidence shows that incentive compensation was always wholly within Marsh's discretion, including the option of granting LTI awards.  Def. SOF ¶ 65; Pl. Resp. ¶ 65.  Once granted, the LTI award vested over time only if he continued to be employed; thus, the unvested LTI is not compensation for past services, but compensation contingent on his continued employment.  See, e.g., Harrison v. NetCentric Corp., 433 Mass. 465, 473 (2001) (unvested shares not compensation for past services); McCone v. New England Tel. and Tel. Co., 393 Mass. 231, 234-235 (1984) (rejecting plaintiff's argument that because promotion and increase in salary and benefits was based on past performance, it was earned compensation for past work).  The fact that, in granting LTI, Marsh may have been motivated by a desire to incentivize Lelio to remain at Marsh does not change the outcome when Marsh had the unfettered discretion to grant no ICP or LTI at all.

Accordingly, the Court finds that Marsh is entitled to summary judgment in its favor on Lelio's claim for breach of the covenant of good faith and fair dealing.

E.  By Failing To Address His Promissory Estoppel And Quantum
Meruit Claims, Lelio Concedes That Dismissal Of Those Claims Is Warranted

In his memorandum, Lelio has failed to address Marsh's arguments that it is entitled to judgment as a matter of law on Lelio's promissory estoppel and quantum meruit claims.  As such, these claims are deemed waived.  See Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 6 (1st Cir. 2010) (by failing to develop argumentation with respect to defendant's liability, plaintiffs waived their claim); Redondo-Borges v. United States Dep't of Housing and Urban Dev., 421 F.3d 1, 6 (1st Cir. 2005) (citation omitted) ("Few principles are more sacrosanct in this circuit than the principle that 'issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'").

At oral argument, Lelio's counsel conceded that summary judgment should be granted on the promissory estoppel claim but not the quantum meruit claim, for which he offered only an oral defense.  In any event, the summary judgment record does not support either claim.  First, in order to establish a promissory estoppel claim, Lelio must show that "(1) a promisor makes a promise which he should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, (2) the promise does induce such action or forbearance, and (3) injustice can be avoided only by enforcement of the promise."  Conte v. Bank of America, N.A., 52 F. Supp. 3d 265, 269 (D. Mass. 2014) (quoting Carroll v. Xerox Corp., 294 F.3d 231, 242 (1st Cir. 2002)).  There is no evidence in the record of any promise that would entitle Lelio to receive the $50,000 LTI award without any contingencies.  He has also pointed to no evidence of any action or forbearance induced by any promise.

Finally, Lelio has not shown a triable issue of fact that he is entitled to recover in quantum meruit.  In order to recover under a theory of quantum meruit, Lelio must show that (1) it conferred a reasonable benefit upon Marsh; (2) Marsh accepted the services with the

reasonable expectation of compensating Lelio; and (3) Lelio provided the services with the reasonable expectation of receiving compensation.  Backman v. Smirnov, 751 F. Supp. 2d 304, 314 (D. Mass. 2010) (citation omitted).  The summary judgment record conclusively establishes that Lelio was not entitled to the LTI award unless he signed certain restrictive covenants and remain employed for three years but Lelio did not sign the covenants and resigned before the award vested.  Def. SOF ¶¶ 51, 61, 62, 74; Pl. Resp. ¶¶ 51, 61, 62, 74.

Accordingly, the Court finds that Marsh is entitled to summary judgment on Lelio's promissory estoppel and quantum meruit claims.

IV.    RECOMMENDATION

For the reasons stated herein, this Court recommends to the District Judge to whom this case is assigned that he grant Marsh's motion for summary judgment.

V.    REVIEW BY DISTRICT JUDGE

The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72(b), any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections.  See Fed. R. Civ. P. 72.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Fed. R. Civ. P. 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  See Phinney v. Wentworth Douglas Hosp., 199 F.3d 1 (1st Cir. 1999); Sunview Condo. Ass'n v. Flexel Int'l, Ltd., 116 F.3d 962 (1st Cir. 1997); Pagano v. Frank, 983

F.2d 343 (1st Cir.1993).

/s/ Jennifer C. Boal
JENNIFER C. BOAL
United States Magistrate Judge